Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2826 | **DATE** | 7/23/2002 |
| **CASE TITLE** | Dollens, et al. vs. Zionts, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion to dismiss plaintiffs' verified derivative complaint [26-1] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | 10 number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | JUL 24 2002 date docketed | 36 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | 02 JUL 23 PM 5:12 | 7/23/2002 date mailed notice | |
| MD | courtroom deputy's initials | FILED-ED 10 | MD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEFFREY DOLLENS and JEFF VUKOVICH, )
derivatively on behalf of )
WESTELL TECHNOLOGIES, INC., )
)
Plaintiffs, )
)
vs. ) No. 01 C 2826
) Judge Joan H. Lefkow
MARC ZIONTS, )
J. WILLIAM NELSON, )
HOWARD L. KIRBY, JR., )
THOMAS A. REYNOLDS, III, )
ROBERT C. PENNY, III )
and MELVIN J. SIMON, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

This case is before the court on the motion of defendants Marc Zionts ("Zionts"), J. William Nelson ("Nelson"), Howard L. Kirby, Jr. ("Kirby"), Thomas A. Reynolds, III ("Reynolds"), Robert C. Penny, III ("Penny") and Melvin J. Simon ("Simon"),[1] who are or were officers or directors of Westell Technologies, Inc. ("Westell"), to dismiss the consolidated complaint brought by two individual shareholders, Jeffrey Dollens ("Dollens") and Jeff Vukovich ("Vukovich"), derivatively on behalf of Westell. In their motion to dismiss, defendants contend (1) that the complaint fails to adequately plead a prerequisite to suit, namely, that a demand by plaintiffs on Westell's board of directors to take action against defendants on

---

[1] Defendants currently hold or held the following positions at Westell: Zionts was Chief Executive Officer ("CEO") from December 1997 until March 1, 2001 and a director from January 2000 until March 1, 2001; Nelson was President and Chief Operating Officer from December 1997 until March 1, 2001 when he became CEO succeeding Zionts and a director since January 2000; Kirby has been a director since March 2000; Reynolds has been a director since January 2000; Penny has been a director since 1998; and Simon has been the Assistant Secretary and Assistant Treasurer and a director since 1992.

behalf of the corporation would be futile, (2) that allegations of fraud underlying the claims in Counts I and II are not pled with particularity as required by Federal Rule of Civil Procedure 9(b), and (3) that Count II fails to plead a legally cognizable theory of damages. For the reasons articulated below, the court grants in part and denies in part defendants' motion to dismiss.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy* v. *Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke* v. *City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *see also DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Although states of mind may be pleaded generally [under Rule 9(b)], the 'circumstances' must be pleaded

2

in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story.").

## FACTS

Plaintiffs' consolidated derivative complaint alleges the following facts, which are taken as true for purposes of this motion: Nominal defendant Westell, a Delaware corporation headquartered in Aurora, Illinois, is a provider of Digital Subscriber Line ("DSL") technology, which allows high-speed data to be transported through local telephone lines. (Compl. ¶ 13.) On May 9, 2000, financial analyst Charles Pluckhahn ("Pluckhahn") of Stephens, Inc., issued a report, stating "[o]n a conference call with analysts, Westell's management indicated that its largest customer of CPE [customer premises equipment] is still unannounced and this new customer would continue to be its largest during the coming fiscal year." Although this customer was "unannounced," Westell "leaked" to analysts that SBC Communications ("SBC"), was driving demand for Westell's DSL equipment. (*Id.* ¶ 14.) Specifically, another analyst, Joseph Bellace ("Bellace") of Jefferies & Co., reported on May 16, 2000 that:

> Demand for DSL related equipment (about 44% of company revenues) continues to be very strong, with good visibility extending for the next three months. Accelerated deployment of DSL service by British Telecom and SBC Communications (an unannounced customer) are driving this performance.

(*Id.*) The net effect of these positive reports was that the price of Westell stock received a temporary bounce to close at $28 a share on May 17, 2000; on June 26, 2000, however, the price of stock closed at $14.6875 a share. (*Id.* ¶¶ 15-16.)

Despite the positive reports, defendants knew by late June 2000 that SBC would be cutting back its purchases of DSL modems from Westell. Defendants acquired this non-public

information through their positions as directors and/or senior officers of Westell and their receipts of reports, attendance at meetings, and access to all of Westell's books, records and other proprietary information. (*Id.* ¶ 12.) Defendants realized that when this information became public, it would seriously affect Westell's revenues, earnings and price of common stock. (*Id.* ¶ 16.) Defendants thus embarked on a massive hype campaign to inflate the price of Westell's stock so that they could unload as much stock as possible before the news concerning SBC's cutbacks in purchases of Westell's DSL modems became public. (*Id.*)

For example, Westell announced on June 28, 2000 that it entered into a new partnership (although it did not specify with whom or what company) to meet the "expanding demand" for its products because it was "running at full capacity in its existing Aurora facility." (*Id.* ¶ 17.) On June 29, 2000, Barry Sine ("Sine"), an analyst at Kaufman Brothers, reported that he spoke with Westell and that "[b]ased on the massive demand for DSL services by Westell's customers," he expected Westell to report strong results for the June quarter. (*Id.* ¶ 18.) He further reported "we believe SBC Communications will again be the company's largest account, despite the fact that it is still an unannounced customer." Sine then issued a "Strong Buy" rating on Westell with a price target of $65 a share. (*Id.* ¶¶ 17-18.)

On July 7, 2000, Bellace issued a "Buy" rating on Westell with a $50 price target. (*Id.* ¶ 19.) As a result of his consultations with officers at Westell, he projected that Westell's 2001 revenues (for the period April 1, 2000 to March 31, 2001) would be $400 to $425 million. As with Sine, Bellace did not know about SBC's cutbacks. On the same day Bellace issued his Buy report, Westell stock increased by 25%, ending at $19 a share.

4

On July 18, 2000, Westell issued what one analyst called a "blockbuster announcement." (*Id.* ¶ 20.) Westell announced that it had established a supplier relationship with SBC. Analysts following Westell responded with uniformly positive reports. On July 20, 2000, an analyst at Kaufman Brothers issued a report reiterating its "Strong Buy" on Westell and $65 price target. The report stated:

> Westell Technologies followed yesterday's blockbuster announcement that it had won SBC Communications (SBC $43 5/8) as a customer with second quarter results that were well above our estimate, consensus, whisper and even telepathic expectations. . . . The key driver of revenue was the company's DSL customer premises equipment (CPE) business, which posted $61.9 million in revenue, 40% higher than our estimate and up 282% sequentially.
>
> * * *
>
> We are today more bullish on shares of Westell Technologies than ever.

(*Id.* ¶¶ 20-22.)

Similarly, on July 21, 2000 another analyst at Chase Hambrecht & Quist Inc. issued a report rating Westell a "Buy" with a $70 price target. The report stated that:

> Growth was once again driven by rapid acceleration in the Company's DSL businesses; [w]e believe that the Company maintains numerous opportunities for additional upside as it continues to capitalize upon its strong relationships with its strategic partners . . . .
>
> * * *
>
> It appears that Westell's DSL businesses continue to fire on all cylinders.

(*Id.* ¶ 23.) As a result of Westell's announcement, the market's reaction was swift and dramatic. (*Id.* ¶ 21.) The price of Westell's common stock rose up to $28.50 a share by July 21, 2000 and closed at $30 a share on July 25, 2000.

From July 21 to August 1, 2000, defendants sold about 450,000 shares of Westell stock total, reaping proceeds of almost $11.5 million. (*Id.* ¶ 24.) Specifically, between July 21 and August 1, 2000, Zionts, who had never sold any Westell stock before this time, sold 231,440 shares at between $28 and $29 a share or approximately 65% of his holdings, reaping proceeds of $5,557,730; on July 21, 2000, Nelson sold 100,000 shares at $27.38 a share or approximately 40% of his holdings, reaping proceeds of $2,738,000; between July 24 and August 1, 2000, Kirby, who had never sold any Westell stock before this time, sold 80,000 shares at between $22.79 and $29.09 a share or approximately 20% of his holdings, reaping proceeds of $2,057,700; on July 24, 2000, Reynolds sold 27,200 shares at $28.46 a share or approximately 30% of his holdings, reaping proceeds of $774,122; on July 25, 2000, Penny sold 4,098 shares at $30 a share, reaping proceeds of $122,940; and on July 25, 2000, Simon sold 5,000 shares at $30 a share, reaping proceeds of $150,000. (*Id.* ¶ 10(a)-(f).)

Only days after defendants unloaded their Westell stock, the real story about SBC's cutbacks emerged. In early August, Bellace reported that SBC had, beginning in June 2000, changed its purchasing requirements for DSL modems, and thus would be ordering fewer modems in the future from Westell. (*Id.* ¶ 25.) The stock price tumbled right back to the mid-to-high teens immediately upon release of the news (which was admittedly known by Westell management six to eight weeks earlier). (*Id.*) As was later reported by Pluckhahn, it was not merely a decline in usage by SBC that had caused Westell's problems but also that SBC had begun purchasing more from Westell's main competitor, Efficient Networks. (*Id.*)

On October 18, 2000, Westell admitted that the decline in orders from SBC would have a material negative effect on its revenues and earnings. Westell reported second quarter DSL

revenues of $49.5 million, many millions lower than what it had assured analysts two months earlier. As a result of this announcement, Westell's stock price dropped to $5.94 a share on October 19, 2000.

Since the release of the various negative reports and with Westell's poor growth prospects, several Westell shareholders commenced a class action on or about October 27, 2000 against Westell (and others), alleging that Westell's public disseminations were materially false and misleading in violation of federal securities laws.[2] Further, on or about August 2, 2001, plaintiffs filed the instant derivative action against nominal defendant Westell and the six named defendants, alleging various breaches of fiduciary duties for insider trading and misappropriation of information under Count I and for exposing Westell to significant liability and damages under Count II.

## DISCUSSION

### A.  Dismissal for failure to plead demand futility

In a derivative action, a shareholder plaintiff seeks to enforce a right that belongs to the corporation. *See Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 95 (1991). "[G]iven 'the basic principle of corporate governance that the decisions of a corporation–including the decision to initiate litigation–should be made by the board of directors or the majority of shareholders,' most jurisdictions require a pre-suit demand be made of the corporation's board of directors." *In re Abbott Laboratories Derivative Shareholders Litig.*, 293 F.3d 378, 386 (7th Cir. 2002), quoting *Kamen*, 500 U.S. at 95. A pre-suit demand "allows the directors to exercise their business

---

[2]There is also the federal securities class action *In re Westell Technologies, Inc. Sec. Litig.*, No. 00 C 6735, which is related to the instant derivative action. (*See* Order, Sept. 4, 2001).

7

judgment and determine whether litigation is in the best interest of the corporation." *In re Abbott*, 293 F.3d at 386.

Federal Rule of Civil Procedure 23.1 requires the derivative complaint to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Because the requirement of a shareholder plaintiff to make a demand on the board of directors "is more than a pleading requirement, it is a substantive right of the shareholder and the directors[.] . . . [T]he law of the state of incorporation . . . controls these substantive rights and governs what excuses are adequate for failure to make a demand." *In re Abbott*, 293 F.3d at 387. Delaware is Westell's state of incorporation and the parties agree that Delaware law applies here.

Plaintiffs concede that they made no demand on Westell's board of directors prior to filing their complaint. However, they aver that a demand would have been futile because five of the eight directors on Westell's board personally benefitted from conduct alleged in their complaint and, therefore, were interested and could not have impartially responded to a demand. (Compl. ¶¶ 11, 44.) In determining whether a demand would be futile, the court must consider whether

> . . . the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993).[3] "To establish a reasonable doubt, plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility . . . [n]or must plaintiffs demonstrate a reasonable probability of success on the merits." *McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001), citing *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988) and *Rales*, 634 A.2d at 934.

"[W]hether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the Board must be determined from the accumulation of all the facts taken together." *McCall*, 239 at 816-17. A director is interested when "he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stockholders." *Id.* at 825, quoting *Rales*, 634 A.2d at 936. However, "the 'mere threat' of personal liability in the derivative action does not render a director interested[.]" *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). Rather, "reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present 'a substantial likelihood' of liability on the part of a director." *McCall*, 239 F.3d at 825, citing *Rales*, 634 A.2d at 936. Moreover, "[e]ven if a director has no personal interest in a decision, his discretion must also be free from the influence of other interested persons." *Seminaris*, 662 A.2d at 1354. A director is independent if he can make a decision "based on the corporate merits of the subject before the board rather than

---

[3]Because plaintiffs assert that they are not challenging a business decision by Westell's board of directors, the demand futility test in *Rales*, 622 A.2d at 934, and not *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), applies here. *See In re Abbott*, 293 F.3d at 387, 388 n.3.

9

extraneous considerations or influences." *Rales*, 662 A.2d at 936, quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984).

Defendants assert that the complaint fails to plead a substantial likelihood of liability on the part of the director defendants (Nelson, Kirby, Reynolds, Penny and Simon) because it does not attribute any of the alleged misrepresentations or knowledge of the SBC problems to these defendants. Defendants further contend the complaint alleges only that defendants are directors (with the exception of Nelson who also is CEO and Simon who also is the Assistant Secretary and Assistant Treasurer) and sold Westell stock, and rely primarily on *McCall*, 239 F.3d at 825.[4] Plaintiffs assert the director defendants were clearly interested because they knew public disclosure of the decline in orders by SBC would have a material effect on Westell's stock price and sold their stock from July 21 to August 1, 2000. Plaintiffs rely on *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 115-16 (S.D.N.Y. Mar. 9, 2000) and *In re Cooper Companies, Inc. Shareholders Derivative Litig.*, No. 12584, 2000 WL 1664167, at *6-7 (Oct. 31, 2000).

In *McCall*, the court held that the plaintiffs' derivative complaint did not adequately plead demand futility under Delaware law based on insider trading allegations because it did not link the directors' alleged acquisition of non-public material information with their stock sales. 239 F.3d at 825-26. The court recognized that "when directors and officers own stock or receive

---

[4]Moreover, defendants argue the complaint fails to plead that there is a substantial likelihood of liability on the part of the director defendants because it does not allege they engaged in conduct more egregious than mere or gross negligence and also point to Westell's Charter, which precludes directors' liability for actions based on negligence or gross negligence under Section 102(b)(7) of the Delaware Code, 8 Del. Laws 102(b)(7) (2000). Plaintiffs, however, apparently do not intend to pursue a claim for breach of duty of care (Resp. at p. 8) although they aver in their derivative complaint that "[t]he Director Defendants' sales of Westell stock, while in possession and control of this material, non-public information, was a breach of their fiduciary duties of loyalty, good faith, and *due care*." (Compl. ¶ 37) (emphasis added). Thus, the court does not consider whether plaintiffs adequately plead demand futility based on defendants' alleged breach of duty of care or other negligent conduct. See *McCall v. Scott*, 239 F.3d 808, *reh'g granted*, 250 F.3d 997 (6th Cir. 2001), addressing the demand futility exception with respect to directors' liability based on a breach of duty of care claim.

compensation in stock, they should be expected to trade those securities in the normal course of events." *Id.* at 825. As such, it concluded "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information. . . . Further, fraudulent intent may be inferred from the timing and quantities of the trades." *Id.* (internal citations and quotations omitted).

In applying these standards, the *McCall* court looked at the plaintiffs' factual allegations of insider trading over a two year period or from January 1995 to April 1997 and found that the plaintiffs only generally averred that some of the directors sold millions of dollars of the company's stock "at prices artificially inflated by the undisclosed fraudulent practices authorized or permitted by the Board." *Id.* Moreover, the court determined that some of these director defendants maintained their substantial holdings of company stock during this time period and that the plaintiffs also failed to plead, regarding certain directors, the "relative holdings or the timing of the transfers." *Id.* The court then concluded "[a]lthough relying upon the 'red flags' to allege that the directors knew or recklessly disregarded [the company's] improper policies and practices, plaintiffs failed to connect the timing of any of the stock transactions to those warnings." *Id.* at 825-26.

In *In re Oxford Health Plans, Inc.*, 192 F.R.D. at 115-16, the court held that the plaintiffs properly pled demand futility where the director defendants knew of management's misrepresentations to the financial markets concerning the company's financial crisis but feared that taking action would harm the company's market price, result in increased regulatory oversight, slow the growth of the company, and jeopardize their personal and financial interests and their personal ties to the company's CEO. It further determined that any independence or

disinterested status of the directors was lost because two of the director defendants sold company stock when they were in possession of material non-public adverse information and another director received substantial annual contract payments through the board.

In *In re Cooper Companies, Inc. Shareholders Derivative Litig.*, 2000 WL 1664167, at *6-7, the court held that the plaintiffs properly pled demand futility because three directors including the co-chairman profited from and/or participated in a fraud scheme to profit from the purchase and sale of bonds based on inside information. Further, it concluded that two directors lacked independence because they were corporate inferiors to the co-chairman and absented themselves from an emergency board meeting.

After a review of these cases, the court concludes that plaintiffs' allegations do create a reasonable doubt that a majority of Westell's board of eight directors could have exercised disinterested and independent business judgment in responding to a shareholder demand. Defendants attempt to distinguish *In re Oxford Health Plans, Inc.* and *In re Cooper Companies, Inc. Shareholders Derivative Litig.* by arguing that the plaintiffs in those cases pled more particularized facts. Plaintiffs' allegations here, however, are similar to the facts pled in those cases because, although plaintiffs do not specify the exact manner in which defendants knew SBC would order fewer modems from Westell (Compl ¶¶ 10, 12), plaintiffs allege the director defendants learned about this non-public information by late June 2000 and sold their Westell stock when the price was artificially inflated by Westell's "blockbuster announcement" that it won SBC as a customer. Further, right after the director defendants sold their stock, the negative news of SBC's cutbacks became public and Westell stock declined from a high of $30 a share to the mid-to-high teens.

12

Moreover, unlike the facts in *McCall* where the court examined insider trading allegations within a time period of over two years or from January 1995 to April 1997, here plaintiffs' allegations focus on a ten day time period during which the director defendants sold their Westell stock. Specifically, plaintiffs allege Nelson unloaded 40% of his holdings between July 24 and August 1, 2000; Kirby, who never sold Westell stock before, unloaded 20% of his holdings on July 24; and Reynolds unloaded 30% of his holdings on July 25. Although in smaller amounts, still coincident in timing, Simon sold 5,000 shares, and Penny sold 4,098 shares on July 25, realizing profits of $150,000 and $122,940, respectively.[5] As to Simon, a director and the Assistant Secretary and Assistant Treasurer, and Penny, an outside director, plaintiffs do not allege that Simon or Penny unloaded large amounts of their personal holdings of Westell stock or that prior to that time period, they never traded their Westell stock. However, Delaware law provides that "where all the defendant directors allegedly engaged in insider trading within a matter of weeks based upon the same inside information, . . . the insider trading claims should be viewed collectively." *Strougo v. Carroll*, No. 8040, 1991 WL 9978, at *4, 17 Del. J. Corp. L. 352, 362 (Del. Ch. Jan. 29, 1991) (unpublished); *see also In re Gen. Instrument Corp. Sec. Litig.*, 23 F. Supp. 2d 867, 874 (N.D. Ill. 1998), quoting *Strougo*. As such, plaintiffs have adequately pled that five of Westell's eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. *See Strougo*, 1991 WL 9978, at *4, 17 Del. J. Corp. L. at 362 ("Common sense suggests that, at a

---

[5]Plaintiffs include Zionts' sales of stock during that ten day period when arguing that the director defendants were interested. However, when plaintiffs filed their derivative complaint in August 2001, Zionts had not been a director for approximately five months or since March 2001. *Rales*, 634 A.2d at 934 (stating demand futility pled "as of the time the complaint is filed"); (*see also* Compl. ¶ 11.)

board meeting at which plaintiff's demand might be considered, the defendant directors' interest in their own alleged wrongdoing would affect their decisions as to whether to sue their co-directors for the same alleged wrongs."). Accordingly, defendants' motion to dismiss for failure to plead demand futility is denied.

**B.     Dismissal for failure to plead fraud with particularity**

Alternatively, defendants argue that even if plaintiffs' demand is excused as futile, plaintiffs' complaint should be dismissed for failure to plead fraud with specificity in Counts I and II under Federal Rule of Civil Procedure 9(b). Plaintiffs respond (in a footnote) that they do not need to plead their claims for breach of fiduciary duty under Rule 9(b) (Resp. p. 10 n.5) but plaintiffs also rely on *In re Cendant Corp. Derivative Action Litig.*, in which the court applied the Rule 9(b) standard. 189 F.R.D. 117, 131 (D.N.J. 1999) (holding the plaintiffs pled fraud with particularity in their insider trading claim under Delaware law because the plaintiffs alleged the defendants knew at the time of their stock sales that the company's earning reports were inflated by accounting improprieties, which would cause the inflated price of the company's stock to fall down).

Although plaintiffs claim they are only alleging that defendants engaged in insider trading, they also allege that defendants made misrepresentations to the public in order to artificially inflate Westell's stock price.[6] Indeed, plaintiffs' derivative complaint arises from the same operative facts as those identified in the class action complaint in *In re Westell*

---

[6]Plaintiffs make the following allegations: Westell disseminated false and misleading information (Compl. ¶ 4) and kept the public "in the dark about the nature and extent of the SBC problem" (*Id.* ¶ 19), and defendants engaged in "a massive hype campaign . . . to inflate the price of the Company's stock[.]" (*Id.* ¶ 16.)

14

*Technologies, Inc. Sec. Litig.*, No. 00 C 6735 (see Mem. Op. and Order, Oct. 26, 2001 at p. 20).[7] Therefore, the court will apply Rule 9(b). *See In re Gen. Instrument Corp. Sec. Litig.*, No. 96 C 1129, 1997 WL 610452, at *10 (N.D. Ill. Sept. 24, 1997).

In the class action, the plaintiff alleged that defendants Zionts, Nelson, Kirby, Reynolds and other defendants not named in the instant derivative action violated the Securities Act of 1934 by knowingly and/or recklessly making false and misleading statements to the class plaintiffs through press releases and conversations with analysts. Further, the plaintiff alleged that some of these defendants personally profited from these misrepresentations by selling their personal holdings to the class plaintiffs after artificially inflating the price of Westell stock. On defendants' motion to dismiss, the court found it could be reasonably inferred from the plaintiff's class complaint that Westell's spokesperson made the allegedly false and misleading statements as authorized by Zionts and other Westell top management. However, the court dismissed Nelson, Kirby and Reynolds as defendants because there was no basis to infer from the class complaint that any of them was a declarant or otherwise involved in making false or misleading statements even though it found the plaintiff alleged a strong inference of scienter based on insider trading as to Nelson, Kirby and Reynolds as well as Zionts.

For these same reasons, all of the defendants except for Zionts must be dismissed with respect to any claims of breach of fiduciary duty based on alleged misrepresentations they made to the public since there is no basis to infer from plaintiffs' derivative complaint that any of them

---

[7] Whether plaintiffs meet the Rule 9(b) standard involves another argument raised by defendants in their motion to dismiss, which is that Nelson, Kirby, Reynolds, Penny and Simon be dismissed for the same reasons the court dismissed Nelson, Kirby and Reynolds as defendants in the *In re Westell Technologies, Inc. Sec. Litigation*, No. 00 C 6735. Therefore, the court addresses that argument here as well.

15

was a declarant or otherwise involved in making false or misleading statements. Nevertheless, Delaware law provides a separate claim of breach of fiduciary duty based on insider trading. *See In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. at 131 (D.N.J. 1999); *accord Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such a profit or advantage is not gained at the expense of the fiduciary[,]" citing *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7 (Del. Ch. 1949)). Thus, for the same reasons plaintiffs adequately pled demand futility, the claim for insider trading will remain against each defendant. Accordingly, defendants' motion to dismiss for failure to plead fraud with particularity is granted in part and denied in part with respect to Counts I and II.

C.  **Dismissal for failure to plead a legally cognizable theory of damages under Count II**

Defendants next move to dismiss Count II, asserting plaintiffs fail to plead a legally cognizable theory of damages. Specifically, defendants argue that plaintiffs' claims for damages based on Westell's potential exposure in defending class actions including significant legal liability and costs is premature and damages based on harm to Westell's integrity in the market and goodwill is conclusional.

With respect to plaintiffs' claim for damages based on Westell's exposure to defending class actions, plaintiffs cannot bring a derivative action to recover expenses from a pending securities action involving Westell until the case has proceeded to final judgment or settlement. *In re United Telecomm., Inc. Sec. Litig.*, No. 90-2251-EEO, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993); *cf. In re Symbol Tech. Sec. Litig.*, 762 F. Supp. 510, 516-17 (E.D.N.Y. 1991) (holding that the derivative plaintiff could not seek litigation expenses associated with a

16

securities class action that had not yet proceeded to final judgment or settlement under a claim for corporate waste). Thus, this claim for damages is premature and must be dismissed. *See In re Symbol*, 762 F. Supp. at 516-17.

Moreover, with respect to plaintiffs' claim for damages based on Westell's "integrity in the market" and "loss of goodwill" (Compl. ¶¶ 4, 27, 28, 41), this claim is conclusional and insufficient because plaintiffs do not apprise defendants of the basis and extent of the alleged damages. *In re United Telecomm.*, 1993 WL 100202, at *2; *accord In re Symbol*, 762 F. Supp. at 517 (rejecting an injury in the marketplace theory and stating "damages must be shown to directly flow from the wrongful acts of defendants, and not the mere commencement of legal proceedings against the corporation."). Therefore, this claim is dismissed.[8]

Accordingly, defendants' motion to dismiss Count II for failure to plead a legally cognizable theory of damages is granted in so far as plaintiffs plead damages based on Westell's defending the pending federal securities action (Compl. ¶¶ 4, 27, 41) and Westell's loss of integrity in the market (*id.* ¶¶ 28, 41) and goodwill (*id.* ¶ 41).

---

[8] However, where plaintiffs allege that defendants are liable to Westell under Count II (Compl. ¶ 42), a claim for damages based on that allegation is legally cognizable since Delaware law "has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through breach of their fiduciary duties." *In re Symbol*, 762 F. Supp. at 517. Therefore, that claim for damages under Count II must remain.

17

## ORDER

Wherefore, and for the reasons stated above, defendants' motion to dismiss plaintiffs' verified derivative complaint [#26-1] is granted in part and denied in part.

ENTER: *Joan H. Lefkow*
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: July 22, 2002